IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

SHAWNA ENSLEY,                          :
                                        :
            Plaintiff,                  :
                                        :
      v.                                :     CIVIL ACTION NO.
                                        :     2:12-CV-254-RWS
NORTH GEORGIA MOUNTAIN                   :
CRISIS NETWORK, INC.;                   :
NORTH GEORGIA MOUNTAIN                   :
CRISIS NETWORK INC. GROUP               :
HEALTH AND DENTAL                       :
INSURANCE PLAN; and                     :
HOWARD SLAUGHTER,                       :
STEVEN MIRACLE, and JODI                :
SPIEGEL in their capacities as          :
fiduciaries of the North Georgia        :
Mountain Crisis Network, Inc.           :
Group Health Insurance Plan,            :
                                        :
            Defendants.                 :

## ORDER

This case is before the Court on Plaintiff's Motion for Summary

Judgment [37], Defendants' Motion for Summary Judgment [38], and

Defendants' Motion to Disqualify Attorney [48].  After reviewing the record,

the Court enters the following Order.

## Background[1]

Plaintiff is a former employee of the North Georgia Mountain Crisis Center ("Crisis Center" or "Center").  Each of the individual defendants is, or at all relevant times was, a member of the Board of Directors ("Board") of the Center.  At all material times, the Board was responsible for hiring the Executive Director, approving the employee manual, determining what benefits to offer employees, and signing checks to pay insurance premiums.  During Plaintiff's tenure there, the Crisis Center sponsored and maintained a fully-insured group employee health, dental, and vision plan on behalf of its full-time employees ("Plan").  The Crisis Center served as the Plan Administrator.  The Board delegated to the Executive Director Plan administration duties.  The individual Board members are being sued in their capacity as Plan fiduciaries.

The Crisis Center paid 100% of employee-only premiums for employees participating in the Plan.  The Crisis Center did not distribute a Summary Plan Description ("SPD") of the Plan during Plaintiff's tenure.  Instead, the Center produced a written employee manual, which articulated, among other internal policies, an employee's eligibility to participate in the Plan.  Initially, the Crisis

---

[1] Unless otherwise noted, the facts are taken from Plaintiff's and Defendants' respective Statements of Material Facts ([37-1], [38-2]) and are admitted.

2

Center's benefit policy stated: "Health insurance will be offered to all full-time employees after the three month probationary period. The availability of insurance will depend on the budget constraints as well as the employees [sic] need for insurance (if already covered by a spouse)." Later, the policy was amended to include all full-time employees, regardless of coverage through a spouse. The Crisis Center's insurance agent, Gerald Hill, also provided a three-page summary of benefits to all eligible employees during open enrollment meetings, which described deductibles, co-insurance, and co-pays.

Plaintiff was hired as a full-time employee of the Center in August 2001. Plaintiff reported directly to the Center's Assistant Director, Sue Kilburn, who reported to the Executive Director. At the time she was hired, Plaintiff and her children were insured under a group health plan sponsored by her husband's employer. However, at the time of hire, Plaintiff informed the Crisis Center that she wanted to enroll in the Plan. After the Plan's 90-day waiting period, Plaintiff would have become eligible to participate in the Plan in October 2001. Plaintiff was informed by Kilburn and then-Executive Director Cindy Westberg that she was not eligible to enroll in the Plan because she was already covered through her spouse.

3

About a year into her employment, Plaintiff began questioning the Center's policy regarding her participation in the Plan. According to Plaintiff, every other full-time employee was allowed to participate in the Plan. Plaintiff claims she continually complained to Board members about being denied benefits, but Defendant Howard Slaughter "brushed [her] off" and Defendant Steven Miracle just said "he would look into it." (Pl.'s Depo., [37-3] at 49-50 of 73.) The Board president at the time told Plaintiff he "did not like conflict."

In 2002 or 2003, Plaintiff advised the Center that her husband's plan surcharged employees who enrolled in the plan when they had alternative insurance available through their spouses. Mr. Ensley, Kilburn, and Westberg informed Mr. Ensley's employer that Plaintiff was ineligible for coverage under the Center's Plan. As a result, no surcharge was imposed for Plaintiff joining her husband's plan.

On March 21, 2006, Plaintiff signed a Member Enrollment Application declining coverage under the Plan. Plaintiff claims that she "was told [she] had to sign a waiver," and she did so involuntarily. (Pl.'s Depo., [37-3] at 39-40 of 73.) During her deposition, Plaintiff could not recall who directed her to decline coverage, but said it would "usually" be Linda Holler or Gerald Hill, the

4

insurance agent. (Id. at 39 of 70.)  Both Holler and Hill testified that they never

told Plaintiff she had to decline coverage.  (Holler Depo. [37-4] at 13 of 27; Hill

Depo., [38-7] at 10 of 11.)  Hill explained that for the Plan to issue at all, every

full-time employee (i.e., eligible employee) had to either sign a waiver or enroll

in the Plan.  (Hill Depo., [37-8] at 2 of 9; Hill Depo., [38-7] at 9 of 11.)  In a

subsequent declaration, Plaintiff said she asked her supervisors, Kilburn and

Westberg, if she could enroll in coverage rather than sign the waiver and they

said "no."  (Pl.'s Dec., [37-10] ¶ 14.)  Plaintiff also testified that she complained

to Kilburn, Westberg, and Holler about having to sign the waiver.

In mid-2007, Holler became Executive Director of the Center and

Plaintiff was promoted to Assistant Director.  After the 2007 open enrollment

period ended, Plaintiff advised Holler that she had been denied the opportunity

to enroll in the Plan because of the Center's purported spousal-coverage

exception.  Holler advised Plaintiff that any such exception would violate the

terms of the Plan.  In fact, Holler informed Plaintiff that the Board allowed

Holler to participate in the Plan even though she was insured through her

husband.  Plaintiff expressed concern to Holler that she may lose her job if she

asked the Board again to allow her to participate in the Plan.  At that time, Steve

5

Miracle was president of the Board and referred to Plaintiff as "the mouth." (Holler Depo., [37-4] at 24 of 27.)

Holler testified that she called Board members Miracle and Slaughter and spoke with them about Plaintiff's eligibility for the Plan.  (Id. at 8 of 27.) Holler told Miracle that she believed Plaintiff was eligible for the Plan. According to Holler, Miracle said he already knew about it, but did not instruct Holler to take any action.  (Id. at 8-10 of 27.)  Miracle testified that it came to his attention in 2011 that Plaintiff was not participating in the Plan, but he could not recall if he was aware of it earlier. (Miracle Depo., [38-4] at 9 of 20.)

In November 2007, the Center's employee manual was revised to clarify that all full-time employees (past their 90-day probationary period) were eligible for health benefits, without reference to any spousal-coverage exception.  Plaintiff testified that she was given a copy of the new manual. (Pl.'s Depo., [37-3] at 17 of 73.)  Plaintiff claims that after she reviewed the new manual, she asked Holler again if she could enroll in the Plan during the March 2008 open enrollment period.  She claims that Holler said "no."  (Pl.'s Dec., [37-10] ¶ 20.)

6

On March 3, 2008, Plaintiff again signed an Enrollment and Waiver Form declining medical, dental, vision, term life, and disability coverage under the Plan.  The Form indicates that Plaintiff declined coverage because she was covered through her spouse.  (Pl.'s Depo., [38-6], Ex. 5 at 47-51 of 55.)  Plaintiff claims that Holler told her she had to sign the 2008 waiver.  (Pl.'s Depo., [37-3] at 42 of 73.)  However, as noted above, Holler maintains she never told Plaintiff she needed to decline coverage.  (Holler Depo. [37-4] at 13 of 27.)  Plaintiff signed a similar form on March 4, 2010, waiving medical, dental and vision benefits under the Plan because she had spousal coverage.  (Id., Ex. 6 at 52-55 of 55.)  Again, Plaintiff claims she signed the form "unwillingly" because Holler told her she had to.  (Pl.'s Depo., [37-3] at 46 of 73.)

Holler testified that whenever the Crisis Center hired a new employee Plaintiff "would express that she felt like she was discriminated against because she was never offered [Plan coverage], but that she did not feel comfortable doing anything about it."  (Holler Depo., [37-4] at 13 of 27.)  At some point, Holler wrote in an email: "I had told [Plaintiff] that the board had discussed bonuses for us and thought this would go a way to pacify her, but obviously

7

not." (Id. at 23 of 27.) Plaintiff testified that she was given a $500 bonus in 2011 or 2012, and was told by Holler that the Board hoped it would satisfy Plaintiff and "make the insurance issue go away." (Pl.'s Depo., [37-3] at 53 of 73.) Plaintiff also testified that she was told she "had been climbing and [her] position had been promoted, [her] salary had increased, and [she] should be satisfied with that." (Id. at 46 of 73.) Additionally, Plaintiff testified that Holler told her to stop complaining about health insurance because she should be happy with the raises she received. (Id. at 47-48 of 73.) Plaintiff had the impression that Holler was passing on the sentiments of the Board. (Id.)

On July 25 and 26, 2011, Plaintiff sent emails to Miracle and Holler expressing concern that she was not on the Center's Plan and demanding reimbursement for the monthly premiums she was required to pay for coverage under her husband's plan. In her July 25 email, Plaintiff stated: "I realize the current board of directors had nothing to do with this discrimination, however, the mess is left for you all to resolve. . . . I chose to keep my mouth shut because I needed my job and no one handled any corruption that was taking place." (Pl.'s Depo., Ex. 3, [38-6] at 40 of 55.) Miracle said he would share Plaintiff's concerns with the rest of the Board and get her a response. Miracle

exchanged emails with fellow Board member Jodi Spiegal regarding Plaintiff's demand.  Spiegal, an attorney by trade, and Miracle were both "concerned about where this might end up" and about "exposure of the organization."  The Board agreed to consult with an ERISA attorney about Plaintiff's situation.

Ultimately, the Board told Plaintiff they would not reimburse her for the monthly premiums.  However, they believed Plaintiff had a right to participate in the Plan and they offered her coverage even though she had signed the 2010 waiver.  Because the open enrollment period was over, Plaintiff was not eligible to immediately enroll in the Plan.  So the Center purchased an individual plan for Plaintiff, effective September 12, 2011.  Plaintiff remained on her husband's plan even after she enrolled in the individual plan.

During the March 2012 open enrollment period, Plaintiff elected self-only coverage under the Plan.  Her coverage became effective April 1, 2012.  Again, Plaintiff did not drop coverage through her husband's plan.  Plaintiff claims that soon after her enrollment in the Plan, Holler advised her to "lay low" with the Board: Holler said, "the Board is after you" and "Jodi Spiegel is pissed" because Plaintiff used the word "discrimination" in her July 25, 2011 email.  (Pl.'s Depo., [37-3] at 24, 36, 54-55 of 73.)

On or around April 6, 2012, Holler resigned as Executive Director of the Center. After Holler resigned, Miracle became the acting director. Around this time, Plaintiff had conversations with Board members about Center employees Angela Usry and Sheila Traub, and the infighting and chaos they were causing at the office. Plaintiff expressed concern that the Board was only listening to Traub, not Usry. Plaintiff testified that the Traub-Usry conflict was affecting everyone, people were choosing sides between them, and tensions were running high in the workplace. (Pl.'s Depo., [38-6] at 34 of 55.)

On June 7, 2012, the Board met. Spiegel testified that they discussed infighting at the Center involving Plaintiff, Traub and Usry. (Spiegel Depo., [37-5] at 10 of 11; Spiegel Depo., [38-5] at 8 of 20.) She described the situation between the three women as "volcanic, just erupting, erupting, erupting, boom." (Spiegel Depo., [38-5] at 7 of 20.) Board member Slaughter also testified that there was "a lot of infighting" between these three women. (Slaughter Depo., [38-8] at 4 of 5.) Similarly, Miracle testified that there were "serious personality conflicts" between the women, "and it got to the point where people got into corners and started lobbing bombs at each other." (Miracle Depo., [38-4] at 16 of 20.)

10

The Center was trying to find a permanent Executive Director to replace Holler, but Miracle testified that Plaintiff, then Assistant Director, was not considered for the position "based in part on the feedback that [the Center was] getting from other agencies in the community." (Id. at 14 of 20.) He stated that after Holler left, it surfaced that the staff at the Center was "a difficult group to work with" and the Board wanted "to have a group cooperate more closely with the other agencies." (Id. at 15 of 20.) Furthermore, according to Spiegel, the Board "did not want a Director to start with [Plaintiff's] level of angst . . . [and the Board] didn't feel that we needed an Assistant Director that has the feelings she had towards us, the antagonistic position, the insubordination." (Spiegel Depo., [38-5] at 9 of 20.)

The Board resolved at its June 7, 2012 meeting to terminate Plaintiff. Usry and Traub had already resigned their positions. However, on June 8, Miracle and fellow Board member Andrea Gibby met with Plaintiff and advised her to "take some time off and to get a little bit of distance on whatever is going on here and . . . take a breath and get a perspective." (Id. at 10 of 23.) Plaintiff's keys were taken from her and she went on a paid vacation she had previously planned. Plaintiff claims that at the June 8 meeting with Miracle and

11

Gibby she brought up her complaints of past discrimination.  (Pl.'s Dec., [37-10] at 9 of 10.)  However, as Defendants note, Plaintiff stated in her deposition that she could not recall using the word "discrimination" with Board members other than in her July 25, 2011 email.  (Pl.'s Depo., [38-6] at 14 of 55.)

While Plaintiff was away on vacation, she contacted attorney Paul Sharman to discuss potential ERISA and discrimination claims against various Board members.  Sharman contacted the Center and orally requested the Plan's SPD.  On June 20, 2012, the Center, through insurance agent Hill, sent Sharman the three-page summary of the schedule offered by the insurance company.  Hill did not provide Sharman with the SPD because he did not have it and was not responsible for it.

On June 25, 2012, Plaintiff returned to the Crisis Center and was immediately terminated.  By letter dated July 19, 2012, Sharman demanded that the Center provide the SPD for the Plan within thirty days.  On January 17, 2013, the Center again sent him a three-page summary of benefits.  The Center finally provided a copy of the most recent SPD for the Plan on January 23, 2013.

AO 72A
(Rev.8/82)

## Discussion

## I.     Defendants' Motion to Disqualify Attorney

On August 19, 2013, Defendants filed a Notice of Objection to Portions of Declarations of Paul Sharman (counsel for Plaintiff) [46].  Specifically, Defendants objected to paragraph 5 of Sharman's June 26, 2013 declaration [37-12] and all of Sharman's August 2, 2013 declaration [42-2].  Then Defendants filed a Motion to Disqualify Sharman as Plaintiff's attorney [48] on grounds that Sharman had become, through his declarations, a necessary witness on a contested issue.  Defendants concede that their motion to disqualify is moot if the contested declarations are stricken from the record.

On July 22, 2013, Sharman voluntarily withdrew paragraph 5 of the June declaration [41].[2]  Thus, the only remaining issue is Sharman's August declaration.  The August declaration contains a single exhibit: a printout of Sharman's cell phone records from June 22, 2012.  The records reflect that a two-minute call was made from Sharman's cell phone to (706) 455-3044 on that date.  In his declaration, Sharman attests that the phone records are kept in the course of his regularly conducted business activity.

---

[2] The Court has not relied on this withdrawn evidence in its discussion of the facts or merits of this case.

13

Plaintiff argues that Sharman is not a necessary fact witness and disqualification is unwarranted.  (Pl.'s Resp. Br., [49].)  The August declaration does not contain any substantive testimony as to the content or purpose of the phone call; it simply authenticates Sharman's business records.  (Id. at 4 of 9.)  Plaintiff represents to the Court that Sharman's testimony will not be needed at trial.  (Id. at 6 of 9.)  Plaintiff maintains, "undersigned counsel's business record speaks for itself and may be authenticated (if necessary) by counsel's telephone service provider."  (Id.)  Further, Plaintiff claims, "undersigned counsel does not have to testify for the trier to infer the substance of the June 22, 2012 telephone call because Plaintiff may establish that fact through other evidence, including but not limited to inference."  (Id.)

Based on Plaintiff's representation that Sharman will not testify as a fact witness regarding the phone call, the Court finds disqualification of Sharman unnecessary and Defendants' motion is **DENIED**.  However, the Court reserves ruling on the admissibility and materiality of the phone records at any future trial.

## II.     Motions for Summary Judgment

### A.      Legal Standard

14

Federal Rule of Civil Procedure 56 requires that summary judgment be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." "The moving party bears 'the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1259 (11th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). Where the moving party makes such a showing, the burden shifts to the non-movant, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact does exist. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

The applicable substantive law identifies which facts are material. Id. at 248. A fact is not material if a dispute over that fact will not affect the outcome of the suit under the governing law. Id. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the non-moving party. Id. at 249-50.

15

Finally, in resolving a motion for summary judgment, the court must view all evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Patton v. Triad Guar. Ins. Corp., 277 F.3d 1294, 1296 (11th Cir. 2002). But, the court is bound only to draw those inferences which are reasonable. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (internal citations omitted); see also Matsushita, 475 U.S. at 586 (once the moving party has met its burden under Rule 56(a), the nonmoving party "must do more than simply show there is some metaphysical doubt as to the material facts").

B.      Analysis

1.      *Breach of Fiduciary Duty under ERISA (Count I)*

Plaintiff alleges that Defendants "breached their fiduciary duties under ERISA to Plaintiff in refusing to enroll her in or provide her coverage under the Plan upon her date of hire, and upon each successive open and special

16

enrollment period thereafter." (Compl., [1] ¶ 33.)  Further, Plaintiff claims, they breached their fiduciary duties by not providing her with health and dental insurance upon her termination. (Id.)  Plaintiff seeks relief for these alleged violations under 29 U.S.C. § 1132(a)(3).[3]

Defendants argue in their motion for summary judgment that Plaintiff's claim fails for two reasons: (1) the requested relief is not available to Plaintiff under § 1132(a)(3), and (2) Defendants faithfully carried out their duties under ERISA. (Def.s' MSJ Br., [38-1] at 3-8.)  In their reply brief, Defendants also argue that Plaintiff's claim is barred by the statute of limitations under 29 U.S.C. § 1113. (Def.s' Reply Br., [45] at 2-3.)  Section 1113 reads:

> No action may be commenced under this subchapter with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of – (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest day on which the fiduciary could have cured the breach or violation, or (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation.

In November 2007, the Center's employee manual was revised to clarify

---

[3] Section 1132(a)(3) allows participants, beneficiaries, or fiduciaries to bring a civil action "(A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan.

17

that all full-time employees were eligible for benefits, regardless of any spousal

coverage.  Plaintiff testified that she received the new policy.  However, on

March 3, 2008, Plaintiff claims she was forced to sign a waiver of Plan benefits.

This evidence suggests that at least by March 2008, Plaintiff had actual

knowledge that she was being wrongfully denied coverage under the Plan.

Plaintiff did not file suit, however, until October 2012.  Therefore, it appears

that Defendants' statute of limitations argument has merit.

Because applicability of the three-year limitations period to Plaintiff's

claim was addressed for the first time in Defendants' reply brief,[4] the Court will

allow Plaintiff an opportunity to file a surreply on this issue.  Accordingly, the

Court **RESERVES RULING** on Count I.  Plaintiff may file a surreply limited

to this issue within 14 days of the entry of this Order.

---

[4] Defendants make passing reference to the statute of limitations in a footnote
to their brief for summary judgment.  (Def.s' MSJ Br., [38-1] at 6 n. 2.)  In that brief,
Defendants cite a limitations period of six years.  (Id.)  In her response, Plaintiff notes
the six-year limitations period does not apply in cases of fraud or concealment.  (Pl.'s
Resp. Br., [42] at 4-5.)  She argues that § 1113's tolling provisions apply because
Defendants engaged in fraud and/or active concealment.  However, as Defendants
note in their reply, there are no such allegations in Plaintiff's Complaint.  In her
Complaint, she alleges breach of fiduciary duties based on the Board's refusal to allow
her to enroll in the Plan until 2011, and for failing to provide benefits after her
termination.  (Compl., [1] ¶ 33.)  There is no reference to fraud or active concealment
in the Complaint and Plaintiff may not assert these new claims on summary judgment.

AO 72A
(Rev.8/82)

2.    *Failure to Provide SPD and Requisite ERISA Information (Count II)*

In Count II, Plaintiff seeks statutory damages for Defendants' failure to provide her an SPD "and requisite ERISA information." (Compl., [1] ¶¶ 35-42.) Under 29 U.S.C. § 1024(b), plan administrators must furnish Plan participants with SPDs within 90 days of becoming participants and upon written request.[5] A "participant" under ERISA is "any employee . . . who is or may become eligible to receive a benefit of any type from an employee benefit plan which covers employees of such employer . . ., or whose beneficiaries may be eligible to receive any such benefit." 29 U.S.C. § 1002(7). ERISA allows for statutory penalties of up to $110 per day against employers that fail to comply with requests for information. 29 U.S.C. § 1132(c)(1).

Plaintiff argues that when she made a verbal request to enroll in the Plan in August 2001, it triggered Defendants' duty under § 1024(b)(1)(a) to provide Plaintiff with an SPD by November 2001. (Pl.'s Resp. Br., [42] at 14-15.) Thus, she claims, Defendants are liable for a statutory penalty of $387,530. (Id. at 15.) Additionally, she argues, Defendants are liable for $17,380 in statutory

_____

[5] The Complaint also refers to 29 U.S.C. §§ 1025(a) and (c). However, as Defendants note and Plaintiff does not dispute, these sections apply to pension plans, which the Center does not offer. Therefore, these sections are inapplicable.

penalties for failing to provide an SPD within 30 days of her counsel's written request on July 19, 2012. (Id. at 16.) Plaintiff asserts that Defendants acted in bad faith and thus a maximum total penalty of $404,910 is justified. (Id. at 20.)

Defendants admit that Plaintiff was not provided an SPD prior to 2013, but they argue that statutory penalties are inappropriate here for multiple reasons. First, they argue that Plaintiff was not entitled to an SPD following her counsel's written request because the request occurred after her termination and she was no longer a "participant" under ERISA's definition. (Def.s' MSJ Br., [38-1] at 9-10.) Second, they maintain that Plaintiff never requested Plan information prior to her termination. (Def.s' Reply, [45] at 7-9.) They also claim that Plaintiff cannot show she was prejudiced by Defendants' failure to provide an SPD before 2013 or that Defendants acted in bad faith. (Def.s' MSJ Br., [38-1] at 12-14.)

Whether to impose statutory penalties under § 1132(c)(1) is committed to the district courts' discretion. Cromer-Tyler v. Teitel, 294 Fed. App'x 504, 507 (11th Cir. 2008); Hunt v. Hawthorne Assoc.s, Inc., 119 F.3d 888, 914 (11th Cir. 1997). Although there is little guidance in this Circuit on awarding ERISA penalties, other courts have considered: whether the plan administrator made a

good faith effort to comply with a participant's request for information; whether the participant was prejudiced in any meaningful way by the administrator's failure to timely provide information; and whether the participant otherwise had the necessary information (even if it was not obtained through official plan documents).  See, e.g., Crosby v. Rohm & Haas Co., 480 F.3d 423, 431-32 (6th Cir. 2007).

At the outset, as Defendants note, there is no evidence in the record that Plaintiff requested Plan information while she was employed by the Center. Defendants assert in their Statement of Material Facts: "Plaintiff never requested any documents about the Crisis Network's insurance plans while she was employed."  (Def.s' SMF, [38-2] ¶ 22.)  Plaintiff responded: "Denied. Plaintiff at various times *asked her supervisors to enroll her in the Plan and asked questions regarding the Plan documents*."  (Pl.'s Resp. to Def.s' SMF, [42-1] ¶ 22 (emphasis added).)  Plaintiff's response does not convey that she requested the plan documents themselves.  Notably, Plaintiff's own Statement of Material Facts is void of any claim or evidence that she did request Plan information beyond what was published in the employee handbook.  (See generally, Pl.'s SMF, [37-1].)

AO 72A
(Rev.8/82)

The provision under which Plaintiff seeks to recover penalties applies to *requests* for information that go unaddressed for a certain amount of time. <u>See</u> 29 U.S.C. § 1132(c)(1)(B). Defendants may not be penalized under the statute for not providing documents that were never requested. Therefore, Plaintiff's request for $387,530 for Defendants' failure to provide her with an SPD by November 2001 (or any time prior to her termination) is **DENIED.**

It is undisputed that Plaintiff's first written request for information, which triggered Defendants' obligation to provide Plan documents under § 1024(b)(4), occurred weeks after she was terminated by the Center. Defendants argue that Plaintiff was no longer a Plan participant at that time, and therefore had no right to receive Plan documents. In <u>Firestone Tire & Rubber Co. V. Bruch</u>, 489 U.S. 101, 117-18 (1989), the Supreme Court found that "participants" include former employees who have a reasonable expectation of returning to covered employment or a colorable claim to vested benefits. Under <u>Firestone</u>, the former-employee claimant "must have a colorable claim that (1) he or she will prevail in a suit for benefits, or that (2) eligibility requirements will be fulfilled in the future." <u>Id.</u>

22

Here, Plaintiff claims she was entitled to the SPD after her termination because she has a colorable claim to vested benefits.  (Pl.'s Resp. Br., [42] at 16-20.)  The Court agrees with Plaintiff that she has at least a colorable claim to benefits.  See Part II.B.4, *infra*.  Therefore, the Center did have an obligation to provide her with plan information following her attorney's written request, and the Court finds that the Center failed to meet that obligation.  However, the Court **RESERVES RULING** on awarding statutory penalties – a determination left to the Court's discretion – until overall damages in this matter are addressed.[6]

### 3.    *Interference with ERISA Plan Benefits (Count III)*

Plaintiff alleges that Defendants interfered with her protected rights under 29 U.S.C. § 1140[7] by refusing to allow her to participate in the Plan before April 2012, and by terminating her in retaliation for seeking and attempting to use the benefits to which she was entitled.  (Compl., [1] ¶¶ 43-54.)  Defendants

---

[6] As the Court already explained, Plaintiff is not eligible for statutory penalties for the period prior to her attorney's written request for Plan documents.  Thus, the maximum award still at issue is $17,380.

[7] Section 1140 makes it unlawful "for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercise any right to which [s]he is entitled under the provisions of an employee benefit plan . . . ."

AO 72A
(Rev.8/82)

argue they did not interfere with Plaintiff's rights by refusing to offer coverage; rather, Plaintiff consistently waived coverage under the Plan since at least 2006. (Def.s' MSJ Br., [38-1] at 15.)  Further, they argue, Plaintiff cannot maintain a wrongful termination claim under ERISA (i.e., interference with right to future benefits) because she was not terminated for any protected activity.  (Id. at 17-20.)

"The ultimate inquiry in a § [1140] case is whether the employer had the specific intent to interfere with the employee's ERISA rights."  Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1222 (11th Cir. 1993).  "A plaintiff is not required to prove that interference with ERISA rights was the sole reason for the discharge but must show more than the incidental loss of benefits as a result of a discharge.  This burden can be met either by showing direct proof of discrimination or by satisfying the scheme for circumstantial evidence established by McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) . . . ."  Id. at 1222-23 (internal citations omitted).

Under the McDonnell Douglas scheme, a plaintiff must first demonstrate by a preponderance of the evidence a prima facie case of discrimination.

> The burden of establishing a prima facie case is
> not onerous.  In the context of a § [1140] claim

24

> alleging unlawful discharge, a plaintiff may
> establish a prima facie case of discrimination by
> showing (1) that [s]he is entitled to ERISA's
> protection, (2) was qualified for the position,
> and (3) was discharged under circumstances
> that give rise to an inference of discrimination.
> To satisfy the last element the plaintiff does not
> have to prove discriminatory intent but must
> introduce evidence that suggests interference
> with ERISA rights was a motivating factor.

Id. at 1223-24.  If the plaintiff establishes a prima facie case, "a presumption of

discrimination is created, and the defendant must articulate a legitimate

nondiscriminatory reason for its conduct.  If the defendant provides an

acceptable reason for its conduct, the presumption of discrimination disappears,

and the plaintiff must demonstrate that the reason given was a mere pretext for

discrimination."  Id. at 1223.

Here, Defendants claim they had a legitimate reason for terminating

Plaintiff, separate from any protected activity – her infighting with other

employees – and the other employees guilty of similar conduct were also asked

by the Board to leave the Center.  (Def.s' MSJ Br., [38-1] at 17-20.)

Defendants also point to a lack of temporal proximity between Plaintiff's

alleged protected conduct and her termination.  (Id. at 19-20).  Plaintiff argues,

on the other hand, that "she was terminated in close temporal proximity and in

25

direct response to her continued complaints to Defendants about their violations of fiduciary duties to her." (Pl.'s Resp. Br., [42] at 22.) Plaintiff appears to rely entirely on temporal proximity to carry her McDonnell Douglas burden. (See i.d., at 22-23.)

Defendants assert that "the only arguable protected activity was Plaintiff's complaint in July 2011 when she [raised] the issue with the Board regarding not being on the Plan and alleging that the previous Board had discriminated against her." (Def.s' MSJ Br., [38-1] at 18.) Thus, they argue, almost a year lapsed between Plaintiff's complaint and her termination on June 25, 2012. In her declaration, however, Plaintiff claims that in late April and May 2012 she "complained to Miracle about having been treated unfairly in the past because of the insurance issue." (Pl.'s Dec., [37-10] ¶ 34.)

It is true that a plaintiff's burden of causation "can be met by showing close temporal proximity between the statutorily protected activity and the adverse employment action." Thomas v. Cooper Lighting, Inc., 506 F.3d 1361, 1364 (11th Cir. 2007). "But mere temporal proximity, without more, must be 'very close.'" Id. (citing Clarke Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273 (2001)). Some courts have found that three or four months between the

protected activity and the adverse action does not satisfy this "very close" standard.  Id.  Regardless, even if her complaints to Miracle in April and May 2012 were sufficiently close to her termination to support a showing of causation, Plaintiff has not made any attempt to show that Defendants' stated reason for firing her was pretext for discrimination.  Instead, she claims, "Defendants have not proffered evidence refuting that such reason was merely a pretext for intentional discriminatory animus."  (Pl.'s Resp. Br., [42] at 23.) Plaintiff has confused the burden-shifting analysis under McDonnell Douglas: it is *her* burden to show that the reason was pretext.

Here, multiple Board members testified that Plaintiff's infighting with other employees was the reason for her termination.  Perhaps most importantly, the other two women accused of similar conduct were also asked to leave the Center and did resign their positions.  See Short v. Am. Cast Iron Pipe Co., 961 F. Supp. 261, 265 (N.D. Ala. 1997) (finding plaintiff failed to show his termination was directed at ERISA rights where he offered no evidence that his termination for violating company rules was different from treatment of other employees who violated the same rules).  In her response to Defendants' statement of material facts, Plaintiff does not deny that she engaged in

27

infighting with these other employees, or that the Board was concerned with improving the Center's work environment before bringing in a new Executive Director.  (See Pl.'s Resp. to Def.s' SMF, [42-1] ¶¶ 79-90.)  Instead, she relies on her own deposition testimony, which states that she did not seek to replace Holler as Director in April 2012 "[b]ecause Linda Holler warned [her] the board was after [her] for using the word discrimination in an e-mail and [she] burned [her] bridges . . . ."  (Pl.'s Depo., [37-3] at 54 of 73.)  The e-mail referred to by Plaintiff was her July 2011 email demanding reimbursement for premiums, written almost a year before she was terminated.

The Court finds the connection between Plaintiff's July 2011 email and her termination attenuated at best.  Approximately a month after Plaintiff's email, the Center purchased Plaintiff an individual policy and told her she would be allowed to enroll in the Plan.  Several months later, in June 2012, the Board addressed the issue of Plaintiff's infighting and decided to terminate her. Based on the foregoing, the Court finds that Plaintiff has not carried her burden of showing causation or that Defendants' stated reason for her termination was pretext.  Thus, Defendants' Motion for Summary Judgment is **GRANTED** as to Count III.

### 4.      Breach of Employment Contract (Count IV)

Plaintiff claims that Defendants breached her employment contract (specifically, the terms of the employee handbook's benefits provisions) by denying her insurance benefits while she was employed by the Center and by retaliating against her for complaining about the Center's practices in this regard.[8]  (Compl., [1] ¶¶ 55-61.)  Defendants argue that Plaintiff's claim fails as a matter of law because there is no public policy exception to Georgia's employment-at-will doctrine that covers these circumstances.  (Def.s' MSJ Br., [38-1] at 20-23.)  The Court agrees with Plaintiff to the extent her claim is based on Defendants' failure to provide benefits promised in the employee handbook, as revised in November 2007.

In Georgia, employee handbooks may be considered binding contracts "with respect to the employment benefits provided therein," even if the handbook does not bestow upon the employee a definite period of employment.

---

[8] In her response brief, Plaintiff does not mention her retaliation claim.  She limits her discussion Defendants' failure to provide her with insurance benefits as promised in the employee handbook.  (See Pl.'s Resp. Br., [24] at 23-25.)  Because Defendants' arguments and authority on the retaliation portion of Plaintiff's claim appear to have merit, and given Plaintiff's lack of a response, the Court finds that Plaintiff has abandoned her retaliation claim and limits its consideration to Plaintiff's claim for breach of contract for failure to provide promised benefits.

29

Fulton-Dekalb Hosp. Auth. V. Metzger, 417 S.E.2d 163, 164 (Ga. Ct. App.

1992).  The handbook at issue here, as revised in 2007, states that all full-time

employees are eligible for coverage under the Plan at no expense to them.

Plaintiff claims that Defendants' failure to provide the benefits promised in the

handbook between November 2007 and April 1, 2012, entitle her to an award of

compensatory damages.  (Pl.'s Resp. Br., [42] at 24.)  She also contends that

because of the "willful and egregious nature of the breach," she should receive

punitive damages.  (Id.)  Defendants argue they did not breach any employment

contract because Plaintiff was offered coverage since 2006, but she repeatedly

waived such coverage.  (Def.s' Reply, [45] at 14.)  Further, they maintain, even

if they did breach the employment contract, punitive damages are not available

because Plaintiff did not plead fraud with specificity in her Complaint.  (Id. at

14-15.)

The Court agrees with Defendants that exemplary damages are not

appropriate for this contract claim.  It is true that punitive damages may be

awarded in contract actions where there are matters of record relating to fraud.

See Clark v. Aenchbacher, 283 S.E.2d 442, 444 (Ga. Ct. App. 1977).  However,

30

as Defendants note, Plaintiff did not plead fraud and there is no evidence in the record that Defendants engaged in fraudulent conduct.

Regarding Plaintiff's breach of contract claim, the Court finds that there is a material factual dispute as to whether Plaintiff voluntarily waived coverage under the Plan. She admits that she signed waivers, but claims that she did so because she was told she had no other choice. Therefore, Plaintiff's and Defendants' motions for summary judgment are **DENIED** as to Count IV.

5. *Failure to Provide Requisite ERISA Documents Upon Request (Count V)*

Plaintiff alleges that Defendants breached their duty under 29 U.S.C. § 1024(b)(4) to provide Plaintiff with a copy of the Plan's SPD within thirty days of her counsel's written request and are thus liable for statutory damages under § 1132(c)(1). (Compl., [1] ¶¶ 62-67.) For the reasons stated in Part II.B.2, *supra*, the Court **RESERVES RULING** on this claim.

6. *Failure to Provide COBRA Notice or Continuation of Coverage (Count VI)*

Plaintiff alleges that Defendants failed to provide her notice of termination of her health and dental benefits and her right to continue benefits as required by 29 U.S.C. § 1166. (Compl., [1] ¶¶ 68-74.) Under § 1166(a),

31

plans must provide covered employees, at commencement of coverage, written

notice of their COBRA rights.  Employers are responsible for notifying plan

administrators of certain "qualifying events" that trigger COBRA's

continuation-of-coverage provisions.  29 U.S.C. § 1166(b).  "The termination

(other than by reason of such employee's gross misconduct), or reduction of

hours, of [a] covered employee's employment" is a "qualifying event" under

ERISA.  29 U.S.C. § 1163(2).  Plaintiff maintains, "As a result of Defendants'

failure to notify Plaintiff of her right to elect continuation of coverage under

COBRA, Plaintiff incurred medical expenses and other damages."  (Compl., [1]

¶ 73.)  She also claims that, under 29 U.S.C. § 1132(c)(1), Defendants are liable

for $110.00 per day in statutory penalties for their failure to provide requisite

COBRA notices. (Compl., [1] ¶ 74.)

Defendants move for summary judgment on this claim on grounds that

they fall within COBRA's small employer exception.  (Def.s' MSJ Br., [38-1]

at 23-25 of 28.)  In general, COBRA requires group health plans to offer

continuing coverage (and notice thereof) to qualified employees who are

terminated for reasons other than the employee's gross misconduct.  29 U.S.C.

§ 1161(a).  However, this requirement does not apply "to any group health plan

AO 72A
(Rev.8/82)

for any calendar year if all employers maintaining such plan normally employed fewer than 20 employees on a typical business day during the preceding calendar year." 29 U.S.C. § 1161(b).  Defendants maintain that the Center falls within this exception because it employed fewer than twenty employees for each pay period in the calendar year preceding the filing of Plaintiff's Complaint.  (Def.s' MSJ Br., [38-1] at 25 of 28.)

Plaintiff does not oppose Defendants' argument in her response brief, nor does she raise this claim in her own motion for summary judgment.  (See Pl.'s Resp. Br., [42]; Pl.'s MSJ [37-2].)  The Court finds that Defendants' argument has merit.  Further, there is evidence in the record supporting Defendants' assertion that the Center qualifies as an exempt small employer.  Therefore, Defendants' Motion for Summary Judgment is **GRANTED** as to Count VI.

>    7.    *Attorney Fees under ERISA (Count VII)*

Plaintiff moves for attorney fees under 29 U.S.C. § 1132(g)(1).  (Compl., [1] ¶¶ 75-79.)  Under § 1132(g)(1), the Court may award reasonable attorney's fees and costs to either party.  According to the Supreme Court, step one in determining whether to award fees and costs under ERISA is to determine whether the fee claimant is a "prevailing party."  Hardt v. Reliance Std. Life

Ins. Co., 560 U.S. 242, 249 (2010).  Once that determination is made, courts

may proceed to evaluate whether fees are appropriate based on several factors.

Id.  At this stage of the litigation, the Court is unable to make a threshold

determination on whether Plaintiff is a "prevailing party."  Therefore, Plaintiff's

Motion for Summary Judgment is **DENIED** as to this Count.

## Conclusion

Based on the foregoing, Defendants' Motion to Disqualify Attorney [48]

is **DENIED**.  Plaintiff's Motion for Summary Judgment [37] is **GRANTED, in**

**part** and **DENIED, in part** and Defendants' Motion for Summary Judgment

[38] is **GRANTED, in part** and **DENIED, in part**, as follows:

- The Court **reserves ruling** on Count I (breach of fiduciary duties), pending further briefing on applicability of ERISA's 3-year limitations period to Plaintiff's claim;

- Defendants' Motion for Summary Judgment is **GRANTED** as to Plaintiff's claims in Counts II and IV based on Defendants' failure to provide her with an SPD any time prior to her termination. Defendants' Motion for Summary Judgment is **DENIED** and Plaintiff's Motion for Summary Judgment is **GRANTED** as to the claim in Counts II and IV based on Defendants' failure to timely provide an SPD in response to her attorney's request after her termination. The Court **reserves ruling** on the issue of statutory penalties under Counts II and V until overall damages in this matter are addressed;

34

- Defendants' Motion for Summary Judgment is **GRANTED** as to Count III (interference with Plan benefits/ERISA wrongful termination);

- Summary Judgment is **DENIED** as to Count IV (breach of contract);

- Defendants' Motion for Summary Judgment is **GRANTED** as to Count VI (failure to provide COBRA notice and coverage); and

- Plaintiff's Motion for Summary Judgment is **DENIED** as to Count VII (attorney fees and costs).

Plaintiff may file a surreply on the statute of limitations issue related to the breach of fiduciary claim within 14 days of the entry of this Order.

**SO ORDERED**, this 19<u>th</u> day of March, 2014.

RICHARD W. STORY
UNITED STATES DISTRICT JUDGE

AO 72A
(Rev.8/82)